# EXHIBIT 5

## DECLARATION OF SHARYL CARRIGAN, MSW, LICSW

I, Sharyl Carrigan, state as follows based on personal knowledge:

1. I am over eighteen years of age and understand the obligations of an oath.

**My Background and Credentials**

2. I am currently employed as a behavioral health Utilization Review Clinician ("UR Clinician") for Tufts Health Plan. I have worked for Tufts Health Plan as a behavioral health UR Clinician for the past 11 years.

3. After receiving my Bachelor's Degree, I went on to obtain a Master's in Social Work from Simmons College. I am an independently-licensed social worker, and am licensed by the Commonwealth of Massachusetts. Independent licensure is the highest level of professional licensure for Master's degree-level mental health clinicians in Massachusetts. I have maintained my professional license throughout my career, including throughout my employment at Tufts Health Plan. Among other things, maintaining my license as a clinical social worker entails fulfilling regular continuing education requirements.

4. After receiving my MSW, I went on to earn a Certificate of Advanced Graduate Studies in trauma.

5. My professional and clinical expertise is in the provision of mental health care to child and adolescent members, particularly those suffering from the effects of exposure to trauma. I have devoted my career to the field of social work. Previously, I was the Clinical Director of a residential treatment facility for adolescent girls. Before I joined Tufts Health Plan, I gained 4 years of clinical experience serving children, adolescents and their families, totaling over 15 years in the social work field.

### My Utilization Review Role at Tufts Health Plan

6. At Tufts Health Plan, I conduct clinical utilization review ("UR") as a member of the Child and Adolescent Services Team, within the Behavioral Health Department. Along with myself, the team consists of six other independently-licensed Master's-level mental health clinicians who have developed clinical backgrounds in the treatment of children and adolescents. The Child and Adolescent Services Behavioral Health Team performs UR for both commercial and public health insurance plans.

7. As a behavioral health UR Clinician, my job is to use my clinical judgment and experience to review requests by mental health care providers for prior authorization of services for children and adolescent plan members. Specifically, I must apply my professional knowledge, experience, and judgment in order to determine whether the services that our members are attempting to access are medically necessary and appropriate. Although I perform UR for both public and private plans, the majority of the child and adolescent member population with which I work is enrolled in MassHealth (the Massachusetts Medicaid program). As a result, the medical necessity guidelines that provide the framework for my UR are usually those required as a matter of public regulation by MassHealth.

8. In order to perform clinical reviews, I frequently communicate and have discussions with members' treating clinicians. I apply my clinical background and experience to ask the requesting providers questions regarding the particulars of the members' family and social backgrounds, treatment history, as well as their medical and behavioral health histories, thereby eliciting the information that is necessary for me to determine whether the requested services are appropriate and meet established medical necessity guidelines.

9. I and the other clinicians on our team use a "decision tree" software to assist us in our determinations of medical necessity. The decision tree is embedded with specific questions, and is a guide of sorts to help determine whether requested services are medically necessary. However, I find that the decision tree questions may not always elicit all of the data I need to gain a complete understanding of a member's mental health and treatment history, family and social background, socioeconomic circumstances, and other facts that, in my professional experience and judgment, are critical to ensuring that the requested services are both medically necessary and – just as if not more important — the best and most appropriate services that the member can access.

10. Consequently, in my conversations with a requesting provider, I usually ask many further questions based on my own clinical judgment, in addition to those posed by the decision tree. I would not know what additional information is relevant, or what further questions to ask a requesting provider, if I were not an experienced and trained mental health professional. Indeed, I do not believe that I would have been capable of performing well in my current UR role with Tufts Health Plan as a new Master's graduate lacking in clinical experience. I certainly cannot imagine a person lacking a professional background in behavioral health performing my job functions. Rather, my body of knowledge and clinical experience are critical to my ability to do this job well. I am able to understand the unique issues that arise with respect to the child and adolescent member population due to my educational background and clinical experience in treating child and adolescent members.

11. I do not view my role as a UR Clinician as involving only determinations of medical necessity. Rather, for me and my colleagues on the Child and Adolescent Services Behavioral Health Team, our role is, in part, to work with the providers to help shape a care plan

that ensures the member receives services that are appropriate and effective. This is particularly so where the requesting provider is new to the behavioral health field.

12. For example, sometimes, after gathering the relevant facts and gaining an understanding of the member's circumstances, I reach the conclusion that the requesting provider is not seeking the correct or optimal treatment. To take but one example, I recall an instance in which a provider was requesting in-home behavioral health services for a child who presented with Post-Traumatic Stress Disorder. Using the decision tree as a guide, I found that it was helpful for me to gather additional information, beyond what was prompted by the decision tree fields, because I was concerned that in-home behavioral services were not the right modality for the child. By opening up a dialogue with the provider, I was able to help shape the member's care and ensure the member was receiving treatment that was not only medically necessary, but also the best treatment option.

13. If I determine, through use of the decision tree and other information I obtain in the course of my review, that requested services are medically necessary, then I am fully authorized to grant prior authorization for those services. On the other hand, if, during the review, the requested services do not appear to be medically necessary, the provider and I will dialogue around this to see if we can reach an agreement regarding the appropriate course of action going forward.

14. For example, a provider recently requested 3 months of services for a member. During the clinical review, I determined that the child's family did not appear to have been invested in following through with treatment recommendations, which had resulted in a lack of progress. Particularly in the context of behavioral health services for children and adolescents, the success of an intervention often depends on the commitment of the child's family to invest in

following through with the prescribed treatment. I ultimately recommended that the clinician consider proceeding with services for 1 month, rather than 3 months, in order to give the family and child additional time to make gains and follow through with treatment recommendations. In the majority of instances in which I conclude that the services that a provider has proposed are not appropriate, I am able to reach an agreement with the provider through discussions and dialogue of this nature.

15. If, however, I am both unable to approve a request for services or the alternative course of treatment, then I will present the case to a Medical Director. Specifically, I will present the clinical information I have gathered, along with my recommendation, to the Medical Director for further review and consideration.

16. In some ways, I would say the hardest part of my job as a UR Clinician involves the level of autonomy I am afforded in evaluating each case. In the child and adolescent behavioral health context, I frequently find myself using my professional judgment and intuition to assess a family's motivation to change. It can be very challenging to ascertain whether a family has been given enough time to make progress and change through use of mental health services. There are times when I discern that a member is suffering from severe issues or poses a potential danger to themselves or others, and would profoundly benefit from access to services. If I conclude that the child's family is not in a position to facilitate his or her improvement through use of our services, however, then I may be unable to find the requested services are medically necessary. As a UR Clinician, I use my clinical judgment and knowledge every day to make those kinds of assessments.

17. Simply put, I am applying my clinical judgment, knowledge, training, and background every single time I undertake a clinical review. I have a lengthy employment history

working with children and adolescents, and was part of the insurance roll out of the Children's Behavioral Health Initiative. It is imperative, to perform behavioral health UR for children and adolescents, to have a child/adolescent behavioral health background. The sort of UR undertaken by clinicians on the Child and Adolescent Services Team requires an understanding of children and adolescents' symptoms, functioning, the elements of each diagnosis, and the DSM-5 (the current version of the Diagnostic and Statistical Manual of Mental Disorders). Through application of my professional knowledge and experience as a mental health clinician, I am able to interpret the member's clinical information, understand the relevant diagnosis, exercise clinical discretion and judgment in order to determine whether requested treatment is necessary, and help shape the provider's treatment plan to ensure our members are receiving the services they need.

18. In sum, my clinical knowledge is vital to understand the services we are reviewing. The issues that arise in my clinical reviews are markedly different from those that I would expect are implicated in the UR process undertaken by other UR clinicians, such as those who deal primarily with services for older members.

**Workload and Hours of Work**

19. I enjoy a degree of flexibility in the hours I work. For example, if I need to stop working in the middle of the day in order to go to a medical appointment, I am able to do that without any issue.

20. I work remotely from my home 5 days per week. I do not have assigned desk space at Tufts Health Plan's offices in Watertown, Mass. To my knowledge, all of my colleagues on the Child and Adolescent Services Behavioral Health Team also work from home

every day. We normally try to go into the office once per month, or as needed to attend meetings and trainings.

21. To the best of my recollection, I have never met or worked with Sally Drake, Patricia King, or Christopher Kairumba, who I understand to be the plaintiffs in this matter. I know of no reason why any of them would ever have had occasion to observe me performing my job functions. Nor, to my knowledge, would any of them have any basis to know anything about my work schedule or work hours.

22. There are certainly weeks in which I do not work more than 40 hours, but there are others when I do. I understand that my salary covers all hours I work. I do send my manager a logging off email each day, so I have somewhat of a tracking system for hours worked daily, but I would not be able to provide an accurate overall account of hours worked over 40 in a week. Since I do not track my hours, it would be difficult to provide an account of hours worked over 40 in any particular work week with a high degree of confidence.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 31st day of January, 2020.

*Sharyl Carrigan*
Sharyl Carrigan, MSW, LICSW